**AFFIRMED and Opinion Filed June 24, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00488-CR

**FRANK ROBERT BLAES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F17-00535-J**

## MEMORANDUM OPINION

Before Chief Justice Burns, Justice Myers, and Justice Carlyle
Opinion by Justice Carlyle

Frank Robert Blaes appeals his conviction and sentence for murder. He contends (1) the evidence was legally insufficient to support the jury's implicit finding that he did not act in self-defense and (2) the evidence was factually insufficient to support the jury's implicit finding at sentencing that he did not act under the influence of sudden passion. We affirm and, because the issues are settled in law, issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

### I. Background

*A. Initial Altercation at the Motel*

Blaes and three other homeless men—Carl Lee, Gerry Norman, and Gary Stevenson—agreed to split the cost of renting a motel room for a night. After the men checked in, Blaes and Norman fought. Lee and Stevenson each testified that Blaes suddenly attacked Norman and

threatened to kill him over money.[1] Before they could intervene, Blaes had overpowered Norman, punched and kicked Norman numerous times, and left Norman injured on the floor. Blaes then took his backpack and left the motel.

According to both Lee and Stevenson, Norman did not initiate the altercation or throw any punches at Blaes. Moreover, neither Lee nor Stevenson believed Norman posed a threat to Blaes. Lee testified Norman was incapable of defending himself against Blaes because he was much older and suffered from serious medical conditions—including liver cancer and COPD, for which he required oxygen therapy. Lee testified Blaes "knew [Norman] wasn't no competition for him," and Stevenson agreed Norman "didn't even have a chance."

Blaes testified to a different version of events. He stated that, after he returned to the motel room from smoking a cigarette, his backpack was not where he left it. When he asked the other men about it, Norman said he was "missing some money" and then threatened to "kick [Blaes's] ass." Norman then hit Blaes with a telephone, and Blaes hit him back, knocking him down. Norman got back up and told Blaes he was going to kill him. Blaes responded, "I don't think so," and hit Norman again, knocking him over the bed. At that point, Norman threatened to have Blaes killed, and the two men began trading punches until they got tired and agreed to stop fighting. Blaes said he was afraid the three men would later gang up on him, so he grabbed his backpack, left the motel, and went to sleep under a bridge.

---

[1] It is unclear what "money" was at issue in the initial altercation between Blaes and Norman. According to Lee, Blaes accused Norman of "taking money from him or something like that." Lee did not think Blaes confronted Norman about paying for the room, because Norman had already paid for the room. And as far as Lee knew, Blaes never paid his share. He testified that Blaes approached Norman and "start[ed] accusing him of having his money. And [Norman] told him he didn't. So [Blaes] just started hitting him." Stevenson testified that Blaes came into the room and attacked Norman, saying "You owe me $50; I wanna kill you; I wanna kill you." Blaes, however, testified that the initial dispute arose because Norman confronted him about money Norman claimed he was missing. According to Blaes, he paid for his share of the room, and he believed he should have been refunded that money because he ultimately did not end up staying in the room—it is for this alleged refund Blaes acknowledges he tried to find Norman in the lead-up to the confrontation the following day.

*B. The Next Day*

The next day, Norman was fatally injured after a violent confrontation with Blaes. Lee and Stevenson testified to the same general events. After arriving at a fast-food restaurant where they often hung out, Lee and Stevenson encountered Blaes. According to Lee, Blaes said, "There that motherfucker is; he better have my money." They saw Blaes walk over and hit Norman, which Lee said knocked Norman to the ground. They heard Blaes threaten to kill Norman and heard him demanding money. At some point, Norman got away and staggered into the restaurant to call for help. Stevenson called 911. Blaes walked to a bus stop.

Witnesses inside the restaurant said Norman asked to use the phone, he looked beat up, and his eyes were purple and swollen. Norman did seem angry, according to one witness, who reported he said he was going to "go out there and kill him."

Soon thereafter, however, Lee and Stevenson saw Blaes kicking Norman in the head with steel-toed boots while Norman was on the ground. A restaurant witness, one Haynes, saw Blaes stomping Norman where he'd fallen. Stevenson said they tried to break it up and that Blaes was "trying to kill him." Haynes said this was not a fight, it was an attack. Lee heard Blaes again threaten to kill Norman and noted Norman ended up knocked out with blood running from his head. After Blaes realized Norman was no longer responsive, he went back to the bus stop. Paramedics took Norman to the hospital.

Lee saw Blaes punch Norman "[p]robably about 15 times," and saw Blaes kick him "at least five to six times." Stevenson admitted on cross-examination that though he may not have seen the absolute beginning of this part of the beating by "miss[ing] a blow or something," he "saw 99.5% of it." Stevenson had known Norman a long time, and Norman was not the kind of person who went looking for fights.

No witness saw Norman hit Blaes. No witness saw Norman with a weapon of any kind.

*Blaes's Account*

The State showed the jury Blaes's initial interview with police. In that interview, Blaes claimed he went down to the restaurant to see Lee and encountered Norman there. He explained to the detective that, because he did not end up staying in the room, he wanted his money back. According to Blaes, Norman had only refunded $12 of the original $31 he paid. So he asked Norman "where's my cash?" and Norman responded: "Fuck you and your cash." At that point, according to Blaes, Norman swung at him. Blaes hit Norman, they swung at each other a few times, and Blaes left. He said they were fighting between two trucks, so no one could see them. But he acknowledged punching Norman with his fists and "kick[ing] him in his ribs a couple times." When asked whether Norman seemed like he was injured, Blaes said Norman kept swinging at him and was getting up when he was leaving to go to the bus stop. Blaes said that after the fight, he just walked over to the bus stop, got on a bus, and left.

When asked if he felt threatened by Norman to the point that he felt like Norman was going to kill him, Blaes shrugged, thought about it for a few seconds, and then responded: "I felt threatened." But Blaes acknowledged that, although Norman swung at him, Norman never actually hit him.

Blaes denied threatening to kill Norman and said that if Norman said otherwise, "he's full of shit." The detective then told Blaes Norman had died because of his injuries. Blaes appeared surprised and said he only "hit him maybe three times that day." He elaborated that he initially hit Norman, kneed him twice, and then hit him again. Norman fell down, but he got up as Blaes was walking away to the bus stop. When the detective suggested he probably just meant to hurt Norman because they were fighting, Blaes responded: "I was defending myself is what I was doing."

At trial, Blaes said that after he left the motel following the first altercation, he slept under a bridge. He went over to the restaurant early that morning and was sitting around. At some point,

he was sitting on the retaining wall near the restaurant when Lee and Stevenson approached. Blaes asked them: "[S]o, where's your boy at? You know, so I can get my money back." Lee said Norman would be there in a minute, Lee went to sit down, and Stevenson went to the store.

A couple of minutes later, Norman came up behind Blaes and hit him in the side of the head. At that point, Norman jumped down off the retaining wall and the two started fighting. When asked whether any of Norman's punches were hitting him, Blaes testified: "Yeah, it was a fight." Blaes denied stomping Norman with his boots or kicking him in the head, and he explained that witnesses must have seen him "kicking my backpack and his backpack out of the way so I wouldn't trip over it every time he came at me or he wouldn't trip over it every time he came at me."

Blaes claimed the two fought only once that day, and Norman was getting up off the ground when he left. When asked whether he intended to cause Norman serious bodily injury, Blaes responded: "I was just trying to keep him from beating the crap outta me." He then responded more directly that he did not intend to cause serious bodily harm. He added: "It's tragic what happened. But in no means did I mean for anything like that to happen. By no means."

On cross, Blaes admitted that he told the detective in his interview that Norman never actually hit him. He also acknowledged that the boots he wore had steel toes and that kicking someone in the ribs or head with those boots would cause serious bodily injury. Finally, he acknowledged he never saw Norman with a weapon when they fought.

*Norman's Injuries*

Paramedics found Norman lying on his back, bleeding from the left side of his head, bleeding from a laceration on his left eye, and bruising on his eyes and chin. At the hospital, doctors performed emergency surgery to remove portions of his skull to alleviate pressure on his brain due to bleeding. The treating physician testified that Norman's condition was consistent with a traumatic brain injury. The medical examiner noted injuries to Norman's eyes, face, chin, lip, ear,

head, shoulder region, arms, chest, and abdomen. The autopsy report concluded Norman died as a result of blunt-force trauma to the head, and classified his death as a homicide.

## II. The evidence was legally sufficient to support the jury's implicit rejection of Blaes's claim that he acted in self-defense.

In his first issue, Blaes contends the evidence was legally insufficient for the jury to reject his assertion that he acted in self-defense. We review sufficiency challenges to the jury's rejection of a self-defense claim under the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Alexander v. State*, No. 05-1700599-CR, 2018 WL 5919129, at *6 (Tex. App.—Dallas Nov. 13, 2018, pet. ref'd) (mem. op., not designated for publication). Thus, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational factfinder could have found the essential elements of murder and rejected the defendant's assertion of self-defense beyond a reasonable doubt. *See Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Alexander*, 2018 WL 5919129, at *6.

Whether a defendant acted in self-defense is a factual issue for the jury, and it is exclusively within the jury's province to determine the weight and credibility of the evidence supporting a self-defense claim. *See Saxton*, 804 S.W.2d 910 at 914; *Alexander*, 2018 WL 5919129, at *6. We therefore cannot "re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

To convict Blaes of murder as charged in the indictment, the jury had to find beyond a reasonable doubt that Blaes either: (1) intentionally or knowingly caused Norman's death; or (2) both intended to cause Norman serious bodily injury and committed an act that was clearly dangerous to human life which caused Norman's death. TEX. PENAL CODE ANN. § 19.02(b)(1)-(2). Under section 9.31 of the Penal Code, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the

actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Section 9.32 adds that the use of deadly force requires a reasonable belief that deadly force is "immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(2). The term "deadly force" refers to "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3).

Here, there was abundant evidence to show both that Blaes intended to cause Norman serious bodily injury and that he committed an act that was clearly dangerous to human life which resulted in Norman's death. *See id.* § 19.02(b)(1)-(2). Multiple witnesses reported seeing Blaes repeatedly punch and kick Norman with steel-toed boots. Moreover, both Lee and Stevenson testified they saw Blaes kicking Norman in the head, an act which Blaes himself acknowledged would likely cause serious bodily harm. And Norman died from blunt-force trauma to the head.

In essence, Blaes asks us to re-weigh the evidence on his self-defense claim. He asserts that, because Lee and Stevenson acknowledged they may not have seen portions of his confrontation with Norman at the restaurant,[2] the jury was required to credit his testimony that Norman initiated those confrontations. But whether Norman or Blaes started the fight, a rational fact-finder could have concluded he was not justified in using deadly force. And Lee testified he saw Blaes attack Norman in the initial confrontation at the restaurant, and Haynes said she saw Blaes attack Norman in the second confrontation. Moreover, in his interview with police, Blaes admitted Norman never actually hit him, which contradicted his testimony at trial.

In addition, Lee and Stevenson both testified that Norman stood no chance in a fight with Blaes—an assessment that proved accurate based on witness accounts of the confrontations

---

[2] Lee testified his back was turned and his view was obstructed in the lead up to the final confrontation at the restaurant. But he testified he saw Blaes attack Norman in the initial altercation that day. Stevenson testified he did not see Norman approach the retaining wall to sit down before the initial confrontation at the restaurant, but he saw Blaes attack Norman after he sat down. Stevenson further acknowledged that he may not have seen the entire second confrontation at the restaurant, but he saw "99.5%" of it.

between the two. Thus, it does not matter whether Lee or Stevenson acknowledged being unable to see each confrontation in its entirety. Viewed in the light most favorable to the verdict, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Blaes did not beat Norman to death in response to a reasonable belief that such force was immediately necessary to protect against Norman's use or attempted use of unlawful force—much less deadly force. We overrule Blaes's first issue.

### III. The evidence was factually sufficient to support the jury's implied finding that Blaes did not act in sudden passion.

Blaes argues in his second issue that—at the punishment phase—the jury was required to find by a preponderance of the evidence that he caused Norman's death while "under the immediate influence of sudden passion arising from an adequate cause." *See id.* § 19.02(d). The term "sudden passion" refers to "passion directly caused by and arising out of provocation by the individual killed . . . which . . . arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). The term "adequate cause" means a "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

Although sudden passion is raised at the punishment phase, "it is analogous to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence." *Gaona v. State*, 498 S.W.3d 706, 710 (Tex. App.—Dallas 2016, pet. ref'd). Thus, in reviewing a factual-sufficiency challenge to a jury's negative finding of sudden passion, we consider all the evidence in a neutral light without usurping the jury's function of assessing the weight of the evidence and the credibility of the witnesses' testimony. *See Matlock v. State*, 392 S.W.3d 662, 670–71 (Tex. Crim. App. 2013). We cannot reverse unless the "verdict is so much

against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* at 671.

Blaes again asks us to substitute our judgment for the jury's with respect to the weight and credibility of the evidence against him. He argues that because, "from [his] point of view, Norman, Carl Lee, and Gary Stevenson ganged up on him, took his money, and stole his bag," and then Norman "tried to sucker punch him in the side of the head," it was easy to see how he "would snap." He contends Lee's and Stevenson's testimony could not be trusted because they may have conspired with Norman to take Blaes's money, adding that "[i]t makes much more sense that a man whose sole possessions were in danger of being taken, who had only recently adjusted to life on the streets, and who seemed to be taken advantage of by the other three men, would lose his capability for cool reflection." Maybe, maybe not.

The jury was not required to adopt Blaes's version of the facts. Witnesses testified Blaes instigated the confrontation with Norman at the motel, asked where he could find Norman the next day, instigated the initial confrontation with Norman outside the restaurant, left the restaurant after Norman went inside the restaurant, then returned to attack Norman again, and that Norman never tried to hit him during any of the confrontations. We conclude the jury's rejection of Blaes's claim that he acted under the immediate influence of sudden passion was not so "against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671.

We affirm.

/Cory L. Carlyle/
_____
CORY L. CARLYLE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
180488F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

FRANK ROBERT BLAES, Appellant

No. 05-18-00488-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 3, Dallas County, Texas
Trial Court Cause No. F17-00535-J.
Opinion delivered by Justice Carlyle. Chief Justice Burns and Justice Myers participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered June 24, 2019